UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| DENISE A. PETSCHE and<br>JAY R. PETSCHE,<br><br>                              Plaintiffs,<br><br>v.<br><br>EMC MORTGAGE CORPORATION and<br>GURSTEL CHARGO, P.A.,<br><br>                              Defendants. | Civil No. 10-4750 (JRT/TNL)<br><br>**MEMORANDUM OPINION AND<br>ORDER ON CROSS SUMMARY<br>JUDGMENT MOTIONS** |

John A. Hamer, **HOFFMAN LAW OFFICE**, P.O. Box 935, Faribault, MN 55021, for plaintiffs;

Curtis D. Ripley, **LEONARD STREET AND DEINARD, PA**, 150 South 5th Street Suite 2300, Minneapolis, MN, 55402, for defendant EMC Mortgage Corporation;

Bridget A. Sullivan, **GURSTEL, STALOCH & CHARGO, P.A.**, 6681 Country Club Drive, Golden Valley, MN 55427, for defendant Gurstel Chargo, P.A.

Defendant EMC Mortgage Corporation ("EMC") obtained a judgment against plaintiffs Denise and Jay Petsche ("the Petsches") in the amount of $33,258.95 stemming from the Petsches' default on a mortgage. Following protracted negotiations to settle the debt through Defendant Gurstel Chargo ("Gurstel"), EMC's counsel and collection agent, EMC garnished approximately $37,000 from the Petsches' bank account. The Petsches claim that the parties had reached a $4,000 settlement agreement, and brought this action seeking to recover the difference between the settlement and the garnished amount. The

complaint alleges four counts: (1) breach of contract, (2) conversion, (3) fraud, and (4) violation of the Federal Fair Debt Collection Practices Act ("FDCPA"). The Petsches and Gurstel have moved for summary judgment; EMC has joined Gurstel's motion. Because the Court finds that the settlement agreement is a valid contract that was breached by Gurstel, the Court will grant the Petsches' motion as to the breach of contract count. The Court will grant Gurstel's motion as to the remaining claims and the conversion, fraud, and FDCPA counts are dismissed as to both defendants.

## BACKGROUND

EMC brought a lawsuit against Denise and Jay Petsche in Minnesota state court on a note it held related to the Petsches' second mortgage on an investment property the Petsches lost through foreclosure. The Petsches had secured the loan from EMC to finance a rental property managed by Northmarx Properties. Northmarx Properties, previously JRP Properties, was an incorporated entity that the Petsches wholly owned. (Third Aff. of Bridget Sullivan, Ex. A, Dep. of Jay R. Petsche, at 13-14, 19, 39-40, July 26, Docket No. 32.) The rental income Northmarx / JRP Properties received was used almost entirely to pay the expenses of managing the properties and not retained by the Petsches as personal income. (*Id.* at 14.) EMC obtained a judgment against the Petsches in the amount of $33,258.95 on March 11, 2010. (Aff. of Bridget A. Sullivan, Ex. D, June 27, 2011, Docket No. 20; Decl. of Amy M. Goltz ¶ 4, Aug. 1, 2011, Docket No. 27.)

## I.   Negotiations Leading Up to the July 16, 2010 Call

In November 2008, well before obtaining the state court judgment, EMC retained Gurstel to collect the unpaid loan from the Petsches. Settlement negotiations between Gurstel and Jay Petsche started shortly afterwards. (Aff. of Albert Llaurado ¶¶ 3-15, June 27, 2011, Docket No. 19.) From late 2008, Jay Petsche offered to settle the debt for amounts ranging from $750 to $2,000. (*Id.* ¶¶ 4-10.) EMC typically countered that it would not accept less than 50% of the total amount owed. (*Id.* ¶¶ 5, 7, 9.) On one occasion – April 5, 2010 – Petsche offered to settle the debt for $4,000. Gurstel at first rejected this amount. (*Id.* ¶ 9.)

Petsche submitted a hardship document to EMC in February 2009, and EMC requested financial information to evaluate the hardship request. (*Id.* ¶¶ 6, 10.) Following EMC's review of the Petsches' financial situation, on June 28, 2010, EMC offered through Gurstel to settle the debt for a lump sum of $4,000, which it specified must be paid by July 25, 2010. (*Id.* ¶ 11.)[1] Petsche said he could not pay this amount. The following week, on July 7, 2010, Petsche faxed to Gurstel an offer to settle in full for $2,000, which Gurstel immediately rejected by letter. (*Id.*) That same day, Gurstel mailed a garnishment summons to Wells Fargo, the Petsches' bank. Two days later, on July 9, the bank froze approximately $37,000 in the Petsches' account. (*Id.* ¶ 12.) On July 12, Gurstel sent a letter to the Petsches informing them of the garnishment summons. (*Id.*)

---

[1] This date was later extended to July 26 because July 25 fell on a Sunday.

## II.   Jay Petsche's July 16, 2010 Phone Call with Albert Llaurado

The parties' dispute centers around a July 16, 2010 phone conversation between Jay Petsche and Albert Llaurado, the Gurstel employee assigned to the Petsches' account. At the time of the conversation, Llaurado was not aware that Wells Fargo had frozen the Petsches' funds. (*Id.* ¶¶ 13-14.) Petsche called to accept the $4,000 offer that he had previously declined, though he requested to break the payment into two installments. (*Id.*) Unaware that Wells Fargo was holding the $37,000 per the garnishment summons, Llaurado reiterated the offer that Petsche pay $4,000 by July 26. (*Id.*) Petsche stated that he would "get it done." (*Id.* ¶ 14.) Gurstel recorded the payment as paid in full after the phone conversation. (Second Aff. of Bridget A. Sullivan, Ex. C, Excerpts of Gurstel Chargo's Files at 33, Aug. 1, 2011, Docket No. 26.) After another Gurstel employee found out that Wells Fargo was already holding the approximately $37,000 and relayed the information to Llaurado, Llaurado phoned Petsche on July 19 to tell him that the settlement offer was no longer on the table, and that Gurstel would levy on the full amount. (Llaurado Aff. ¶ 15.) Petsche first spoke with Llaurado's supervisor and later called back to say that his attorney would go after Gurstel for reneging on the settlement agreement. (*Id.* ¶ 16.)

## III.  Post-Call Events

On July 26, 2010 – ten days after the "get it done" call – Jay Petsche personally dropped off a $4,000 check at Gurstel Chargo's offices. (Sullivan Aff. ¶ 5.) Gurstel returned the check three days later. (*Id.*) The Petsches filed exemption claims to the

garnishment, which the Minnesota state court heard and rejected; on August 19, 2010, the court ordered Wells Fargo to release the Petsches' funds to Gurstel.  (*Id.* Ex. D.)

Several months after release of the funds, on October 25, 2010, Denise and Jay Petsche filed a complaint in Minnesota state court alleging breach of contract, conversion, fraud, and violation of the FDCPA.  Gurstel removed the case to federal court on the basis of the alleged FDCPA violation.

## ANALYSIS

**I.   STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment should "identify[] each claim or defense – or the part of each claim or defense – on which summary judgment is sought." *See* Fed. R. Civ. P. 56(a).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. SUMMARY JUDGMENT MOTIONS

The Petsches and Gurstel both move for summary judgment on all counts. The Court will grant the Petsches' motion on the breach of contract claim, and Gurstel's motion on the FDCPA, conversion, and fraud claims. Because both motions raise the same issues, the Court addresses them simultaneously.

### A. Breach of Contract

The Petsches' breach of contract claim presents two central issues: (1) whether the July 16, 2010 phone call gave rise to a contract as a matter of law, and (2) whether any settlement agreement falls within the ambit of the Minnesota Statute of Frauds relating to credit agreements.[2] The Court will grant the Petsches' motion on the breach of contract claim because the phone call of July 16, 2010 gave rise to a contract as a matter of law, and the settlement agreement does not fall within the Minnesota statute of frauds.

---

[2] A breach of contract claim contains four elements: (1) formation of a contract, (2) performance by plaintiff of any conditions precedent, (3) material breach of the contract by defendant, (4) damages. *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000). The issues raised in this motion relate only to the formation prong; the other elements are not in dispute. First, no conditions precedent to the alleged agreement exist. Second, there is no genuine dispute as to material breach. "Whether an act or omission constitutes a material breach of a contract is a fact question." *Sitek v. Striker*, 764 N.W.2d 585, 593 (Minn. Ct. App. 2009). While Minnesota courts have not clearly defined "material breach," *Black's Law Dictionary* defines it as "'[a] breach of contract that is significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus excusing that party from further performance and affording it the right to sue for damages.'" *Id.* (citing Black's Law Dictionary 200 (8th ed. 2004)). The Court finds that Gurstel's purported rescission of the agreement three days after Petsche's alleged acceptance, together with Gurstel's garnishment of funds far exceeding the settlement amount, constituted a material breach. Finally, damages are not disputed to the extent that the amount garnished is well beyond the amount of the alleged settlement agreement.

### 1. The July 16 Phone Conversation Gave Rise to a Contract as a Matter of Law

Under Minnesota law, "the test of contractual formation is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent." *Hill v. Okay Const. Co., Inc.*, 252 N.W.2d 107, 114 (Minn. 1977); *see also Riley Bros. Constr., Inc. v. Shuck*, 704 N.W.2d 197, 202 (Minn. Ct. App. 2005). "The agreement necessary to form a contract . . . may be implied from circumstances that clearly and unequivocally indicate the intention of the parties to enter into a contract." *Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp.*, 617 N.W.2d 67, 75 (Minn. 2000). "The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration." *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006).

A reasonable jury must find that the July 16, 2010 conversation gave rise to a contract. Gurstel offered to settle the debt for $4,000. (*E.g.*, Llaurado Aff. ¶ 11.) While Petsche turned down this offer on June 28, 2010, telling Gurstel's Albert Llaurado that "he could not make this payment because he didn't have the money," Llaurado again extended the offer during the July 16, 2010 phone call. (*Id.*) It is thus immaterial that Jay Petsche's initial rejection of the $4,000 deal functioned to terminate the offer – as, in any event, did his July 7 counteroffer of $2,000. *See Ellison v. Premier Salons Int'l, Inc.*, 164 F.3d 1111, 1113 n.3 (8th Cir. 1999). It remains undisputed that (1) Gurstel as EMC's agent again issued the $4,000 offer on the July 16 call, (2) Petsche "said ok" that he "will

get it done," and (3) that Gurstel's log records the debt as settled in full for $4,000.[3] Petsche's "ok" and "get it done" statements represent an "objective manifestation of assent" to the offer. And the offer was outstanding because the offeror had just reissued it. *See Austin Farm Center, Inc. v. Austin Grain Co.*, 418 N.W.2d 181, 185 (Minn. Ct. App. 1988) (character of acceptance). These undisputed facts – occurring in the context of lengthy settlement negotiations – evince a clear meeting of the minds and demonstrate both parties' intention to be bound.[4]

Petsche's request on the July 16 call to split the $4,000 into two payments does not change the analysis. Even assuming, as Gurstel argues, that Petsche's request amounted to a counteroffer terminating Petsche's power of acceptance, the chronology of the call log makes clear that Llaurado first told Petsche that making two payments was unacceptable and **then** reiterated the one-payment-by-July 26 offer. It was only **after** this statement that Petsche stated "ok" and that he would "get it done." The offer, in short,

---

[3] Gurstel's recordation of the debt as "sif $4k" (settled in full for $4,000) demonstrates its recognition of the "get it done" conversation as amounting to a settlement. Moreover, Gurstel's phone call and letter purporting to "rescind[] the settlement offer" didn't come until three days after Petsche's acceptance. (Llaurado Aff. ¶ 15; Second Sullivan Aff., Ex. B.) While these factors may go more to Gurstel's subjective intent than to the objective meaning of the parties' actions, they are nonetheless helpful as "circumstances that clearly and unequivocally indicate the intention of the parties to enter into a contract." *Webb Bus. Promotions, Inc.*, 617 N.W.2d at 75.

[4] Gurstel also argues that no contract exists because consideration was lacking in that the Petsches simply promised to pay what they were already obligated to pay. This argument fails. Separate consideration is not required here because the debt was liquidated and Gurstel had full knowledge of the terms of the offer. *See Winter Wolff & Co. v. Co-op Lead & Chem. Co.*, 111 N.W.2d 461, 465 (Minn. 1961) ("[W]e have discarded the rule that a separate consideration is necessary in order legally to settle a liquidated debt where the debtor offers less than the full amount and such offer is accepted by the creditor with full knowledge of the terms under which the offer is made.").

was on the table when Petsche accepted it. In sum, the Court finds that the July 16, 2010 phone conversation gave rise to a contract between the Defendants and Jay Petsche to settle the debt sum for $4,000.[5]

### 2. Mistake of Fact and Material Misrepresentation Theories Provide No Basis Upon Which to Void the July 16, 2010 Settlement Agreement

Although a valid settlement agreement was formed, defendants argue that the contract is voidable on a unilateral mistake of fact or fraudulent misrepresentation theory. The doctrine of unilateral mistake allows for nullification of a contract if one party induced or contributed to the mistake, such as by wrongfully concealing material facts from the mistaken party. *Sorensen v. Coast–to–Coast Stores (Central Org.), Inc.*, 353 N.W.2d 666, 670 (Minn. Ct. App. 1984). And while the general rule is that "one party to a transaction has no duty to disclose material facts to the other," *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972), a contract entered into on the basis of a fraudulent misrepresentation may be voided. *E.E. Atkinson & Co. v. Neisner Bros.*, 258 N.W. 151, 154 (Minn. 1935). A duty to disclose arises if the non-disclosing party knows of material facts to which the other party does not have access. *Klein*, 196 N.W.2d at 622. Moreover, concealing those facts may constitute fraud if the non-disclosing party

---

[5] Defendants' claim that finding the existence of a settlement agreement requires the fact finder to hear live testimony and assess witness credibility is unpersuasive. While "assessing the credibility of witnesses and evaluating the weight to assign to their testimony is . . . not a function for the court on a motion for summary judgment," *United States v. Dico, Inc.*, 136 F.3d 572, 579 (8th Cir. 1998), the fact-finder's ability to determine the existence of a contract here does not require witness testimony. The Llaurado Affidavit detailing Gurstel's dealings with Petsche, in addition to excerpts of the electronic notes from Gurstel's file, adequately evidence offer and acceptance.

knows that the other party is acting on the belief that such facts do not exist. *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 812 (Minn. Ct. App. 2010) (citing *Richfield Bank and Trust Co.*, 244 N.W.2d 648, 650 (Minn. 1976)).

Neither theory provides a basis upon which to void the July 16 agreement. While Petsche knew that Gurstel had frozen funds in his account and probably knew that Llaurado was again holding out the $4,000 offer without knowledge of that fact, Gurstel had equal access to the garnishment information. Petsche neither wrongfully concealed material facts to which Gurstel did not have access nor induced or contributed to Llaurado's mistake in some other way. Therefore, the contract cannot be voided or rescinded on a mistake of fact or fraudulent misrepresentation theory.

### 3. Minnesota Law Does Not Require that the Settlement Agreement Be In Writing

The next issue is whether the settlement agreement is unenforceable for failure to satisfy a Minnesota law requiring that "credit agreements" be in writing. The credit agreement statute was enacted in 1985 "to protect lenders from having to litigate claims of oral promises to renew agricultural loans." *Rural Am. Bank of Greenwald v. Herickhoff*, 485 N.W.2d 702, 705 (Minn. 1992). The statute provides that "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Minn. Stat. § 513.33, subd. 2. The statute defines "credit agreement" broadly as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial

accommodation." *Id.* subd. 1. "[C]laims on agreements falling under section 513.33 fail as a matter of law if the agreement is not in writing." *Greuling v. Wells Fargo Home Mortg., Inc.,* 690 N.W.2d 757, 761-62 (Minn. Ct. App. 2005). There is no claim of a writing here. The sole question is thus whether the July 16, 2010 settlement agreement falls within the ambit of section 513.33. The Court finds that it does not.

Gurstel cites a number of authorities for the proposition that the agreement falls under the "financial accommodation" portion of the "credit agreement" definition. While a number of cases reference the "broad" language of the statute, none compels the result that the oral agreement here constitutes a "financial accommodation."

In *Rural American Bank of Greenwald v. Herickhoff*, the Minnesota Supreme Court declined to restrict the "financial accommodation" language to accommodations in the nature of lending or forbearance agreements or other agreements for the extension of credit. 485 N.W.2d 702, 705-06 (Minn. 1992). The Court held that a loan from a bank to two farmers, with certain conditions of repayment amounting to a credit exchange between them, constituted a "financial accommodation" within the meaning of the statute. *Id.* The Court also noted that the legislature intended the statute to apply broadly to protect lenders from having to litigate claims of oral promises. *Id.*

In *Pako Corp. v. Citytrust*, the court held that an oral agreement giving defendant the right to compel an assignment amounted to a "financial accommodation" because it was "an oral aspect of the underlying credit agreement." 109 B.R. 368, 377 (D. Minn. 1989). Gurstel also cites *Carlson v. Estes*, 458 N.W.2d 123, 128 (Minn. Ct. App. 1990), for the proposition that "[w]hen a creditor agrees to forbear repayment of money, this is

clearly a financial accommodation that falls within the statute . . . (Mem. in Supp. of Mot. for Summ. J. at 9, Aug. 1, 2011, Docket No. 25.) *Carlson* held that a lender's oral promise not to record a mortgage was not, in itself, a "credit agreement" required to be in writing, but rather an integral part of the underlying written credit agreement. *Carlson*, 458 N.W. 2d at 127.

These cases do not bear the weight that Defendants would rest on them. While courts have made liberal reference to the "broad application" of the statute – *see, e.g.*, *Becker v. Alliance Bank*, No. A09-1871, 2010 WL 2899586, at \*3 (Minn. Ct. App. July 27, 2010) – no Minnesota court has classified an agreement purporting to settle a debt in full as a "credit agreement." Rather, the unifying theme in the cases is that there is some connection in the alleged oral agreement to the underlying credit agreement. In this case, by contrast, the agreement purports to extinguish the underlying debt, rather than modify it, change the conditions of repayment, or otherwise accommodate the debtor. Therefore, while on its face the language of the statute is broad, the case law does not warrant extending the writing requirement to the agreement at issue here.

In sum, the Court finds that the July 16, 2010 phone conversation gave rise to a contract that falls outside the ambit of the Minnesota Statute of Frauds relating to credit agreements. The Court further concludes that Gurstel breached this contract through its attempt to rescind the offer after it had been accepted. Accordingly, the Court will grant the Petsches' motion and deny Gurstel's motion on the breach of contract claim.

### B. FDCPA

The Petsches allege that defendants violated provisions of the FDCPA by "misleading the Court, rescinding its offer for settlement after acceptance, and misleading the consumers about the time limit in which to accept the settlement offer." (Compl. ¶ 33, Oct. 25, 2011, Docket No. 1.) The FDCPA prohibits "debt collectors" from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The act covers debt relating to consumer, not business, transactions. 15 U.S.C. § 1692(a)(5) (defining debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes"); S. Rep. No. 95-382, at 3 (1977), 1977 U.S.C.C.A.N. 1695 (noting that the FDCPA "applies only to debts contracted by consumers for personal, family, or household purposes," and "has no application to the collection of commercial accounts"). The Court will deny the Petsches' motion and grant Gurstel 's motion on the FDCPA claim because the record makes clear that the Petsches incurred the debt for business purposes.

While the Eighth Circuit has interpreted "debt" broadly – holding it to encompass, for example, collection efforts on dishonored checks, *Duffy v. Landberg*, 133 F.3d 1120, 1122-24 (8th Cir. 1998) – it has not offered particularized guidance for determining whether a given transaction is "primarily for personal, family, or household purposes." The Ninth Circuit's treatment of the question is instructive. In *Bloom v. I.C. System, Inc.*, the court determined that a loan plaintiff obtained from a friend to invest in a software

company was a "business loan" and thus outside the protections of the FDCPA. 972 F.2d 1067 (9th Cir. 1992). The Court "examine[d] the transaction as a whole, paying particular attention to the purpose for which the credit was extended." *Id.* The Seventh Circuit takes the same approach. *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols et al.*, 214 F.3d 872, 875-76 (7th Cir. 2000) (holding that the character of the debt is determined at the time it was incurred and by the purpose for which it was incurred). District courts have approached the inquiry as a "fact driven" process, which "should be decided on a case-by-case . . . basis looking at all relevant factors." *Hansen v. Ticket Track, Inc.*, 280 F. Supp. 2d 1196, 1204 (W.D. Wash. 2003).[6]

There is no dispute that the debt at issue relates to a mortgage taken out on an "investment property" owned by a business. The Petsches used the loan to purchase a rental property for Northmarx Properties, a company the Petsches wholly owned. The Petsches neither lived in the property nor retained the rental income as personal income. The Petsches cite no case law to support their argument that Jay Petsche's having signed the loan documentation in his own name is determinative. The inquiry revolves around the **purpose** for which the debt was incurred, and because the Petsches did not incur the debt "primarily for personal, family, or household purposes," 15 U.S.C. § 1692a(5), it falls outside of the FDCPA.

---

[6] *See also In re Howe*, 446 B.R. 170 (Bankr. E.D. Pa. 2009) (holding that it was the purpose for which credit card debt was accrued that determines whether the obligation was business or consumer related); *Holman v. W. Valley Collection Servs.*, 60 F. Supp. 2d 935, 936 (D. Minn. 1999) (finding that debt incurred to purchase a credit card processing device falls outside the act because such devices are "simply not used primarily for personal, family, or household purposes").

**C.     Conversion**

The Petsches claim that the garnishment amounted to an unlawful conversion. Conversion requires (1) willful interference with the property of another, (2) without lawful justification, that causes (3) the lawful possessor to be deprived of use and possession of the property. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). The Court will grant Gurstel's motion on the conversion claim because no reasonable fact finder could conclude that the garnishment was without lawful justification.

EMC had a valid judgment against the Petsches, and the Minnesota state court ordered release of the funds to Gurstel following its examination and rejection of the Petsches' exemption claims. Because there is no genuine dispute about the validity of EMC's judgment, and Gurstel did not obtain the funds until the Minnesota court ordered Wells Fargo to release them, the Court grants Gurstel's motion on the conversion claim.

**D.     Fraud**

The Petsches allege that defendants made false representations of fact to the Minnesota state court that amounted to fraud in claiming right to the Petsches' property after settlement had been reached. (Compl. ¶¶ 24-29.) The Court will deny the Petsches' motion for summary judgment on the fraud claim and grant Gurstel's motion.

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the rule, a plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making

the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (internal quotation marks omitted). While the level of particularity required depends on the nature of the case, the plaintiff "must typically identify the who, what, where, when, and how of the alleged fraud." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (internal quotation marks omitted). The purpose of the particularity requirement is to allow defendants to respond specifically and quickly to damaging fraud allegations. *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (citation omitted).

The Petsches' conclusory fraud allegations do not satisfy the Rule 9(b) particularity requirement. First, the allegations do not identify the individual who made the misrepresentations to the Rice County Court. Second, the allegations do not identify the false representations that were allegedly made beyond that "defendants claimed to have a right to Plaintiffs' property." Moreover, no reasonable fact finder could conclude that the defendants perpetrated a fraud. The only factual allegation in the record supporting the fraud claim is that on July 26, 2010 "[d]efendants requested a writ of execution from the Rice County Sheriff, which they received and used to seize [the Petsches'] Wells Fargo Bank Account in violation of their settlement agreement." (Compl. ¶ 13.) Because no record evidence supports the fraud claim, the Court will grant Gurstel's motion.

## ORDER

Based on the foregoing of all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs Denise A. Petsche and Jay R. Petsche's Motion for Summary Judgment [Docket No. 13] is **GRANTED in part** and **DENIED in part** as follows:

    a. The motion is **GRANTED** as to the breach of contract claim.

    b. The motion is **DENIED** in all other respects.

2. Defendant Gurstel, Staloch & Chargo PA's Motion for Summary Judgment [Docket No. 24] is **GRANTED in part** and **DENIED in part** as follows:

    a. The motion is **GRANTED** as to the FDCPA claim, fraud claim, and conversion claim.

    b. The motion is **DENIED** as to the breach of contract claim.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: November 15, 2011  
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____  
JOHN R. TUNHEIM  
United States District Judge